# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MSP RECOVERY CLAIMS, SERIES 44 LLC, a Delaware entity,**<br><br>　　　**Plaintiff,**<br><br>**v.**<br><br>**THE HANOVER INSURANCE GROUP, INC., a Foreign Corporation, and AMTRUST FINANCIAL SERVICES, INC.**<br><br>　　　**Defendants.** | **Case No.:** 4:22-cv-40077<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, MSP Recovery Claims Series 44, LLC ("MSPRC 44"), brings this action against The Hanover Insurance Group, Inc. ("Hanover"), and AmTrust Financial Services, Inc. ("Amtrust"), and alleges:

## **INTRODUCTION**

1.　　More than forty years ago, Congress passed the Medicare Secondary Payer Act (the "Act" or "MSP Act") to deal with ballooning medical entitlement costs, by transforming Medicare from the entity that always foots the bill, into a safety net for the medical expenses of beneficiaries who also were covered by private plans and insurers such as Hanover.

2.　　Six years later, Congress recognized that it needed to do more to make this transformation effective and amended the MSP Act to add a private cause of action so persons and private entities could recover secondary payments made by Medicare (and later, by Medicare

Advantage Organizations ("MAOs"))[1] that private plans and insurers had failed to reimburse. Congress provided for double damages, so that private litigants would be motivated to take arms against a recalcitrant insurer.

3.      In 1997, Congress created the "Medicare Advantage" option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), with the hope that Medicare Advantage would eclipse traditional Medicare. Under Medicare Advantage, Medicare enrollees receive their Medicare benefits from private health insurers, which are known as Medicare Advantage Organizations or "MAOs. Today, nearly 40% of all Medicare beneficiaries receive their benefits under a Medicare Advantage Plan.

4.      Even though it is settled law that MAOs have parity of recovery rights with traditional Medicare, auto insurers have disregarded for more than a decade their repayment obligations to MAOs. That failure improperly depletes the trust funds that support Medicare Advantage, which are the same trust funds that support Medicare Parts A and B. *See* 42 U.S.C. § 1395w-23(f). Accordingly, Congress' mandate that Medicare shall not be the entity that always foots the bill is still a long way from being implemented. This case seeks to reconcile, in a structured and fair way, claims for reimbursement that Defendants owes to MAOs that assigned their rights to MSPRC 44, to more effectively implement Congress' original intent in passing the MSP Act.

## DEFENDANTS' DUTIES TO MEDICARE AND MAOS

5.      Hanover is a property and casualty insurer in the business of collecting premiums in exchange for taking on the risk that its insureds will be injured and that Hanover will be

---

[1] MAOs include Medicare Service Organizations ("MSOs"), Independent Physician Associations ("IPAs"), and other first tier and downstream entities (collectively "MAOs").

contractually obligated to pay for its insured's accident-related medical care. Hanover also collects premiums in exchange for taking on the risk that its insureds will injure someone else and Hanover will be required to indemnify its insureds, typically through a settlement agreement that releases the third-party claimant's claim for accident-related medical care.   This complaint highlights one such example involving the settlement of a claim for a slip-and-fall injury. As part of that settlement, Hanover and another insurance company, AmTrust, provided insurance for a hotel and that hotel's architect.

6.     Under each of these circumstances, Defendants fall within the MSP Act's definition of a "primary plan," which includes "an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance." 42 U.S.C. § 1395y(b)(2)(A). As primary plans, Defendants are charged with two duties under the Act: (1) to notify the secondary payer (whether it be Medicare or an MAO) of Defendants' primary payer status, and (2) to repay the secondary payer, within 60 days. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), 1395w-22(a)(4).

7.     If Defendants are rendered primary plans and they fail to repay the Medicare lien within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. Failure to reimburse Medicare or MAOs for accident-related medical payments effectively results in a windfall for Defendants, to the detriment of the Medicare trust funds and taxpayers.

## PARTIES, JURISDICTION, AND VENUE

8.     MSPRC 44 is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, MSPRC 44 established various designated series to serve as units of the company for the purpose of

maintaining various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series.

9.     MSPRC 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to MSPRC 44. MSPRC 44 may receive assignments in the name of MSPRC 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. MSPRC 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

10.     MSPRC 44 made a good faith effort to accurately identify Hanover and AmTrust in this Complaint, in reliance on information obtained from their websites, and reporting data from Insurance Services Office ("ISO") and an independent vendor, MyAbility, which is part of Ability Network. MyAbility allows companies, such as MSPRC 44, to access data that primary payers report to the Centers for Medicare & Medicaid Services ("CMS"). Reporting data attached as **Exhibit A** to this Complaint is taken directly from data inputted by Hanover and AmTrust to CMS, either directly or through Defendants' vendors (such as ISO). Accordingly, any inaccuracy or lack of specificity in the data is attributable to Hanover and/or AmTrust.

11.     Hanover is an insurer that issues liability and no-fault policies and is incorporated in the state of Delaware. According to the Secretary of the Commonwealth of Massachusetts's website, it registered in the State of Massachusetts on February 13, 1995, and its principal place

of business is in the Commonwealth of Massachusetts, at 440 Lincoln Street, Worcester, MA 01653.

12.     AmTrust is an insurer that issues liability policies and is incorporated in the state of Delaware. According to AmTrust's filing with the New York Division of Corporations, its "principal executive office" is located at 59 Maiden Lane, 43rd Floor, New York, New York 10038. However, at the time of the settlement that gives rise to this action, AmTrust's filings with CMS recorded its principal place of business as in the Commonwealth of Massachusetts, at 400 Riverpark Dr., Ste 400, North Reading, MA, 01864.

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§1391 (b), (c), and (d) because at all material times, Hanover and AmTrust resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District. Further, the settlement that is highlighted in this Complaint was made between two insurers that, at the time, both identified their principal place of business as Massachusetts.

15.     Additionally, this Court has personal jurisdiction over Hanover because it is at home in this forum, and personal jurisdiction over Hanover does not offend traditional notions of fair play and substantial justice.

## STANDING ALLEGATIONS

16.     MSPRC 44 uncovers MSP Act noncompliance through data analytics, which requires cross-referencing unreimbursed, accident-related conditional payments in their assignors' claims data with instances where insurers reported to CMS under Section 111 that they were

responsible, which made them primary payers under the MSP Act as a matter of law. While MSPRC 44 has no direct access to the Section 111 reporting, MSPRC 44 obtains reports from a subscription service that contracts with CMS and provides to subscribers what primary payers report to CMS.

17.     While this cross-referencing exercise may be successful in identifying some unreimbursed conditional payments, the bulk of those payments remain hidden without discovery. This is so because insurers either failed to report all their claims pursuant to Section 111 (which until this year, resulted in no penalty) or withdrew their reports prior to detection by an MAO. The only way to fully identify all secondary payments that insurers failed to reimburse is by comparing an MAO's and an insurer's claims data.

18.     For the above reasons, the accurate and complete amount of MSPRC 44's damages cannot be known until after Hanover has produced lists of no-fault and third-party claims that it settled. Accordingly, to show MSPRC 44's standing to pursue claims against Hanover and AmTrust, and to obtain the discovery MSPRC 44 needs, the following example of Defendants' failure to reimburse and comply with the MSP Act are alleged below.

19.     MSPRC 44 sets forth the representative beneficiary below to illustrate Hanover's failure to fulfill its statutory duties when entering into settlements. In this instance, Hanover reported and admitted its primary payer status and responsibility for the accident-related medical expenses for medical items and/or services provided to the representative beneficiary `and for which the assignor made conditional payments.

**The Settlement Claim Representative Beneficiary**

20.     In some instances, Hanover or AmTrust may take on the risk of loss and accident-related medical expenses incurred by one of their insureds when that insured is harmed by a third

party. Conversely, Hanover or AmTrust may bear the risk when one of their insureds is a tortfeasor who harms a Medicare beneficiary. When these instances arise, Hanover or AmTrust may enter into a settlement agreement on behalf of their respective insureds.

21. When an insurer, like Hanover or AmTrust, executes a settlement agreement with an insured who is also a Medicare enrollee, that insurer becomes a primary payer that is responsible for the reimbursement of the medical services rendered to its insured by the Medicare Participants. Defendants' duty to reimburse conditional payments made by Medicare Participants for the health services rendered is nondelegable. Defendants may not transfer their responsibility for reimbursement to covered persons or other third parties.

22. After executing settlement agreements as alleged below, Hanover and AmTrust failed to provide actual notice of their primary payer status to the Medicare participants who paid for the beneficiary's medical expenses. Defendants may not sit, wait, or ignore their affirmative duties under federal law and then invoke absolution under state law.

23. Accordingly, and solely for the purpose of demonstrating standing to pursue claims against Hanover and AmTrust, and to obtain the discovery MSPRC 44 requires, an example of Hanover's failure to reimburse and comply with the MSP Act is alleged below.

**M.I.**

24. On January 1, 2015, M.I. was enrolled in a Medicare Advantage Plan issued by Health First Health Plan ("HFHP"), an MAO and MSPRC 44's assignor in this action.

25. On or about September 4, 2016, M.I. was injured in a slip-and-fall accident at a hotel in Erie County, New York. As a direct and proximate result of the accident, M.I. sustained injuries that required medical items and services.

26. From 2016 to 2019, the hotel in question refused to cover M.I.'s claim for injuries,

instead blaming its architect. This forced MSPRC 44's assignor, HFHP, to cover M.I.'s treatments during that time.

27.     While M.I.'s claim was pending, MSPRC 44 filed a lawsuit against Hanover regarding many other instances of Hanover failing to reimburse HFHP, as required under the MSP Act.[2] As a result, no later than that 2017 lawsuit, Hanover was on notice of its failure to reimburse HFHP for conditional payments for which Hanover was the primary payer.

28.     A list of M.I.'s diagnosis codes and injuries in connection with M.I.'s accident-related treatment is attached hereto as **Exhibit B**. The accident-related medical services were rendered between September 4, 2016 and March 20, 2018. The medical providers subsequently issued bills for payment of M.I.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $208,336.02 for M.I.'s accident-related medical expenses, of which HFHP paid $49,168.18. (*See* **Exhibit B**).[3] At the time HFHP executed its assignment agreement in favor of MSPRC44, HFHP's right to seek reimbursement for M.I.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to M.I.'s accident-related treatment and conveyed them to MSPRC 44. HFHP did not retain the recovery right to M.I.'s claim.

---

[2] *See MSP Recovery Claims, Series LLC v. The Hanover Ins. Co, Inc.*, Case No: 1:17-cv-23985-FAM (S.D. Fla. Oct. 31, 2017).

[3] Some lines appear to record amounts "paid" by HFHP as "$0.00," while other lines show amounts paid that exceed the adjacent sum "billed." This format exists because, when making payments for hospital-based treatments, MSP's assignors often record a single, bulk payment for an aggregate of multiple billed charges. When such a bulk payment occurs, the assignor records a single payment on a line adjacent to the *first* of those aggregate billed charges. The remaining billed charges, by contrast, are listed next to what appear to be "$0.00" payments.

29.     In 2019, the hotel and architect finally agreed to settle M.I.'s claims.[4] That settlement was funded by their respective insurers, Hanover and AmTrust. By virtue of entering into that settlement and obtaining a release of all claims, Hanover and AmTrust became primary payers, responsible for payment and/or reimbursement of M.I.'s accident-related medical expenses.

30.     On an unknown date, Hanover and AmTrust reported information to CMS regarding the accident, the name of the reporting entity, and the type of insurance policy involved. Through this report to CMS, Defendants admitted their primary-payer status, which required them to pay or reimburse M.I.'s accident-related medical expenses. (*See* **Exhibit A**).

31.     This report to CMS did not clearly indicate which insurer (Hanover or AmTrust) provided coverage for which tortfeasor (the hotel or the architect). Even so, this reporting demonstrated that Hanover and AmTrust were aware of their responsibility to reimburse HFHP.

32.     Despite reporting that they were primary payers and making the corresponding admission that they should have paid for M.I.'s accident-related injuries, Hanover and AmTrust failed to remit or reimburse such payments to HFHP.

33.     Defendants were aware of their MSP Act responsibility to reimburse conditional payments advanced for medical services rendered to M.I. Defendants were also aware of their 42 C.F.R. § 411. 24(f)(2) duty to notify the Medicare carrier that paid for M.I.'s medical expenses, in this instance HFHP.

34.     Despite this knowledge, Defendants did not notify HFHP of their primary

---

[4] To preserve M.I.'s private health information, MSPRC 44 is not providing her name, nor that of the hotel and architect, in this public filing. However, MSPRC 44 intends to identify the specific hotel, architect, and Medicare beneficiary once a protective order is in place. In addition, Hanover and MSPRC 44 have discussed M.I.'s claim in pre-suit correspondence.

responsibility to pay for M.I.'s medical expenses. This failure was even more salient, given that MSPRC 44 had already filed a lawsuit against Hanover in 2017. That lawsuit alerted Hanover to its failure to notify or reimburse HFHP, yet Hanover continued this pattern two years later, following the settlement of M.I.'s claim.

35.     In the time since the incident, Defendants have enjoyed the use of HFHP's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse Medicare.

36.     Because Defendants failed to inform MSPRC 44 and HFHP about this settlement, MSPRC 44 was forced to search in the dark for unreimbursed claims. The M.I. claim is just one example of this ongoing pattern.

37.     Hanover ultimately responded to MSPRC 44 in an April 29, 2021 letter, but only to explain that it was aware that M.I. had an accident and suffered severe injury. Rather than pay, Hanover explained in its letter that the insurance companies involved had attempted to shift their primary payer responsibilities to M.I. through contractual indemnity language. Hanover refused to say what other insurers are involved or which entities they insured, claiming these details are "confidential." At the same time, Hanover did not hesitate to disclose the existence of that self-serving indemnity language, which violated federal law by seeking to shift Hanover's obligations onto an injured Medicare beneficiary. Hanover did not deem this self-serving aspect of the settlement to be "confidential."

38.     Hanover's letter also disclosed that the specific Hanover entity that was responding to the letter was not the one that funded the settlement. In a pre-suit phone call, Hanover refused to confirm whether the Hanover entity involved was the "Hanover Insurance Group, Inc.," as reported to CMS, or some other Hanover entity. To justify this lack of clarity, Hanover again

invoked "confidentiality."[5]

39.     As a result, MSPRC 44 expended a great deal of effort and resources to uncover

Defendants' failures in the handling of M.I.'s claims and the unjust enrichment Defendants have

benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC 44 has now

instituted this action to recover the debt.

40.     Accordingly, MSPRC 44 is entitled to collect double damages against Defendants

for their failure to reimburse HFHP's conditional payment for M.I.'s accident-related medical

expenses.

### Statute of Limitations Tolling

41.     To the extent necessary, claims asserted in this Complaint have been tolled as a

matter of law by the pendency of a class action, as to which HFHP was a putative class member,

alleging MSP Act violations related to the actions by Hanover.[6]

### COUNT I

### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)
### (MSPRC 44 v. Hanover, as to HFHP's unreimbursed payments)

42.     MSPRC 44 re-alleges and incorporates by reference each of the allegations

contained in paragraphs 1 to 41 as if fully set forth here.

43.     MSPRC 44 asserts a private cause of action pursuant to 42 U.S.C. §

1395y(b)(3)(A).

---

[5] Because Hanover did admit the state in which the injury occurred, MSPRC 44 was able to scour court records to determine the underlying facts concerning N.I.'s slip-and-fall incident at a hotel.

[6] See class action complaint for damages including the representative beneficiary and claims included in this pleading at *MSP Recovery Claims, Series LLC v. Hanover Ins. Co.*, Case No: 2017-019591-CA-01 (Fla. 11th Jud. Cir. Aug. 10, 2017), and following removal, *MSP Recovery Claims, Series LLC v. The Hanover Ins. Co, Inc.*, Case No: 1:17-cv-23985-FAM (S.D. Fla. Oct. 31, 2017).

44. Hanover's no-fault and liability policies are primary plans, which rendered Hanover the primary payer for its beneficiaries' accident-related medical expenses.

45. As part of providing Medicare benefits under the Medicare Advantage program, HFHP paid for items and services which were also covered by no-fault, personal injury protection, liability, or medical payments policies issued by Hanover.

46. Hanover entered into settlements with beneficiaries relating to accidents but failed to reimburse HFHP for accident-related medical expenses paid by HFHP. As a primary payer, Hanover had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for medical services rendered to beneficiaries. Hanover is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

47. Hanover was required to timely reimburse HFHP for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

48. HFHP suffered damages as a direct result of Hanover's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding Code of Federal Regulations.

49. Hanover derived substantial monetary benefit by placing the burden of financing medical treatments on HFHP.

50. MSPRC 44 only seeks to recoup medical services rendered to beneficiaries that were related to the accidents.

51. MSPRC 44 brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Hanover for its failure to make appropriate and timely reimbursement of conditional payments for beneficiaries' accident-related medical expenses.

## COUNT II

### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)
### (MSPRC 44 v. AmTrust, as to HFHP's unreimbursed payments)

52.     MSPRC 44 re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 to 40 as if fully set forth here.

53.     MSPRC 44 asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

54.     AmTrust's liability policies are primary plans, which rendered AmTrust the primary payer for M.I.'s accident-related medical expenses.

55.     As part of providing Medicare benefits under the Medicare Advantage program, HFHP paid for items and services which were also covered by liability or medical payments policies issued by AmTrust.

56.     AmTrust entered into a settlement with M.I. relating to M.I.'s accident, but failed to reimburse HFHP for accident-related medical expenses paid by HFHP. As a primary payer, AmTrust had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for medical services rendered to beneficiaries. AmTrust is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

57.     AmTrust was required to timely reimburse HFHP for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

58.     HFHP suffered damages as a direct result of AmTrust's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding Code of Federal Regulations.

59.     AmTrust derived substantial monetary benefit by placing the burden of financing

medical treatments on HFHP.

60.     MSPRC 44 only seeks to recoup medical services rendered to beneficiaries that were related to the accidents.

61.     MSPRC 44 brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from AmTrust for its failure to make appropriate and timely reimbursement of conditional payments for beneficiaries' accident-related medical expenses.

**COUNT III**

**Declaratory Relief Pursuant to 28 U.S.C. § 2201**
**(MSPRC 44 v. Hanover, as to HFHP's unreimbursed payments)**

62.     MSPRC 44 re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 to 41 as if fully set forth here.

63.     MSPRC 44 alleges that as part of providing Medicare benefits under the Medicare Advantage program, HFHP paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Hanover.

64.     Hanover entered into settlements with beneficiaries relating to accidents but failed to reimburse HFHP for accident-related medical expenses paid by HFHP. As a primary payer, Hanover had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for accident-related medical services rendered to covered persons. Hanover is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

65.     Hanover was required to timely reimburse HFHP for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

66.     An actual, present, and justiciable controversy has arisen between MSPRC 44 and Hanover concerning its obligation to reimburse HFHP.

67.     Hanover seeks a declaratory judgment from this Court establishing that Hanover has a historical, present, and continuing duty to reimburse HFHP for payments made on behalf of beneficiaries for their accident-related medical expenses. MSPRC 44 also seeks a declaration of what amounts are due and owed by Hanover to HFHP.

68.     A determination of what amounts are owed by Hanover to HFHP is complicated and difficult.

69.     A coordination of benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

70.     The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[7]

71.     The coordination of benefits transaction involves the exchange of thousands of lines of claims data and data points between the parties to determine overlapping instances where HFHP made payment of medical items and services on behalf of a Medicare beneficiary who was also insured by Hanover.

72.     The exchange of claims data would need to be done by extracting and producing certain data fields from Hanover's and Series 44's databases using demographic identifiers, such as Social Security Numbers ("SSN"), Health Insurance Claims Numbers ("HICN"),[8] dates of birth, sex, and addresses. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims; this is done by matching the date of loss (for Hanover) with dates of payment (for MSPRC 44), thus determining what Hanover reimbursed (if

_____

[7] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.

[8] Also known as a Medicare Beneficiary Identifier ("MBI").

anything), and to whom.

73. The data MSPRC 44 requests from Hanover to perform an accounting is information Series 44 is already entitled to without litigation. 42 C.F.R. § 411.25(a); 59 Fed. Reg. 4285.

74. Hanover has refused to share the information sought by MSPRC 44.

75. Given the size of the claims and data points to be exchanged between the parties, the coordination of benefits transaction is complex.

76. An equitable accounting of the amounts owed to MSPRC 44 by Hanover is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law.

77. MSPRC 44 is entitled to an accounting of all instances where Hanover settled a tort claim by one of HFHP's beneficiaries, on behalf of a third-party who was insured by Hanover.

78. MSPRC 44 is also entitled to an accounting of all instances where Hanover accepted coverage under a first-party insurance policy for medical treatments rendered to one of HFHP's beneficiaries.

79. The aforementioned accounting(s) should, at a minimum, include the identity of each such claimant for whose benefit HFHP provided or paid for medical items or services.

80. MSPRC 44 attempted to coordinate with Hanover for an exchange of information, but its efforts to coordinate have been ignored or rejected.

81. Thus, MSPRC 44 lacks an adequate legal remedy to obtain the requested information, and an accounting is the appropriate remedy.

## **JURY TRIAL DEMAND**

MSPRC 44 demands a trial by jury on all of the triable issues within this pleading.

## **PRAYER FOR RELIEF**

WHEREFORE, MSPRC 44, seeks a judgment granting the following relief:

i.    a judgment awarding reimbursement of double damages for those amounts to which MSPRC 44 is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Counts I and II;

iii.   a judgment declaring that Hanover has a historical, present and continuing duty to reimburse HFHP for payments made on behalf of beneficiaries' accident-related medical expenses as alleged in Count III;

iv.   a judgment ordering an accounting of all instances where Hanover settled under a third-party insurance policy or accepted coverage under a first party insurance policy, including the identity of each claimant, or if known to Hanover, claimants for whose benefit HFHP provided or paid for items or services;

v.    a judgment awarding MSPRC 44 pre-judgment and post-judgment interest consistent with the statute; and

vi.   a judgment awarding MSPRC 44 such other and further relief as the Court deems just and proper under the circumstances.

Dated: July 13, 2022.

Respectfully submitted,

ALEX R. STRAUS, ESQ.
Milberg, Coleman, Bryson, Phillips, Grossman, PLLC
*Attorneys for MSPRC 44*
280 S. Beverly Drive, Penthouse
Beverly Hills, California 90212
Tel.: 919-600-5000
Primary Email: astraus@milberg.com

By: */s/ Alex R. Straus*
ALEX R. STRAUS
BBO No. 677434

<u>**APPENDIX 1**</u>
**CMS' Standard for Storing Digital Health Insurance Claims Data**

1.      It is the custom and practice of CMS and Primary Payers to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

      a.   The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

      b.   The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

      c.   Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2.      Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

      a.   <u>Dates (including dates of service)</u>: the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

            i.   According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month).

Sometimes this is alternately expressed as YYYYMMDD.[9]

    ii.   The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010[10], 2011[11], 2012[12], 2013[13], 2014[14], and 2016.[15]

    iii.   CMS has also accepted the MM/DD/YYYY format for its local coverage

---

[9] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[10] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[11] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[12] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[13] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[14] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[15] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

determination data.[16]

    iv.   The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or "DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

    v.   In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

  b.  <u>Medical Diagnosis and Procedure Codes</u>:

    i.   Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital

---

[16] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAA.

resources necessary to treat the condition.[17][18]

    ii. International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

    iii. Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

    iv. Current Procedural Terminology ("CPT") – CPT[19] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National

---

[17] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[18] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information is reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

[19] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

Committee on Vital Statistics or NCVHS.[20]

    v.    Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics and similar costs.[21]

    vi.    Healthcare Common Procedure Coding System (HCPCS) – HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[22]

    vii.    Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

    viii.    The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

---

[20] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

[21] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

[22] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

ix.  CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.

**APPENDIX 2**
**Assignment**

**Health First Health Plans, Inc.**

1.      Effective April 28, 2016, **Health First Health Plans, Inc.** ("HFHP"), a Medicare

Advantage organization, irrevocably assigned all rights to recover payments made on behalf of its

representative beneficiaries to MSP Recovery (the "HFHP Assignment"). The HFHP Assignment

expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, and any of its successors and assigns, any and all of Client's right, title,
> ownership and interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies for Client that Client had,
> may have had, or has asserted against any party in connection with the Claims and
> all rights and claims against primary payers and/or third parties that may be liable
> to Client arising from or relating to the Claims, including claims under consumer
> protection statutes and laws, and all information relating thereto . . . all of which
> shall constitute the "Assigned Claims."
>
> …
>
> The transfer, grant, right, or assignment of any and all of Client's right, title,
> ownership, interest and entitlements in and to the Assigned Claims shall remain the
> confidential and exclusive property of MSP Recovery or its assigns. This
> assignment is irrevocable and absolute.

**Exhibit C**, HFHP Assignment.[23]

2.      A later *nunc pro tunc* agreement, signed on June 1, 2018, further provides:

NOW THEREFORE, in consideration of the mutual covenants set forth herein and
other good and valuable consideration, the receipt and sufficiency of which is hereby

---

[23] The agreements entered between MSP Recovery, Health First Administrative Plans, and Health
First Health Plans have been the subject of much litigation over the last three years. However, the
Eleventh Circuit Court of Appeals, in *MSP Recovery Claims, Series LLC v. QBE Holdings, Inc.*,
965 F. 3d 1210 (11th Cir. 2020), held that the document referenced in paragraph 15 properly
assigned the claims and is the relevant document that provided MSP standing to assert HFHP
recovery rights.

acknowledged, Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, including but not limited to claims payments made for or on behalf of beneficiaries, members and enrollees arising from dates of service between February 5, 2007 and November 23, 2016, all of which shall constitute the "Assigned Claims". Excluded from the definition of Assigned Claims are: (i) Client's <u>data</u> and, (ii) any existing subrogation cases that have been commenced by Client or cases where Client's Members have already filed lawsuits against a primary payer.

**Exhibit D**, HFHP *Nunc Pro Tunc* Assignment. The claims asserted in this case were not asserted in any "existing subrogation cases . . . commenced by [HFHP]," nor in any past lawsuit in which an HFHP beneficiary sued any primary payer.

3.      Further, on October 22, 2020, Series 16-05-456 entered into an assignment agreement with Series 44-20-456, a designated series of MSPRC 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

[Series 16-05-456] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims" ) as such terms are defined in the Agreements.

**Exhibit E**.

4.      This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue

and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto.

5.     Consideration was given between each party in executing these assignments.